### LEWIS v. BACHE et al.

### SAME v. CAHN et al.

*(Common Pleas of New York City and County, General Term.   December 2, 1889.)*

1. ASSIGNMENT FOR BENEFIT OF CREDITORS—PREFERENCES—PARTNERSHIP.
    P. and A., partners in business, drew from the firm, during the month before their assignment, an amount slightly in excess of their usual drawings. It was in small amounts, distributed through the month, and it did not appear that the assignment was in contemplation more than a few days. In their schedule of liabilities were notes given their wives for money furnished to and used by the firm, though the notes on the books were charged to the personal accounts of the partners. In the assignment the fathers of the partners were preferred for amounts loaned the firm. The name of H., a partner, who had retired from the firm a month before the assignment, was inserted in the schedules as a creditor of the firm, for notes given to him by P. and A. for his interest. By the books it appeared that the firm was solvent at that time. P. testified that the cause of the failure was embarrassment and delay in payments by firm debtors. *Held*, that these facts did not show that the assignment was made with intent to defraud creditors.

2. SAME—PRESUMPTIONS—FAILURE TO CALL WITNESSES.
    Where the creditors fail to prove any fraud, no unfavorable inference will be drawn from the fact that the wives of the partners were not called as witnesses.

Appeal from judgment on report of referee.

Actions by David H. Lewis against Semon Bache and others and Henry H. Cahn and others.   Charles E. Hughes, Esq., referee, filed the following report:

"On May 29, 1886, Phraner & Arthur, a firm composed of Wilson S. Phraner and Frank D. Arthur, made a general assignment of their copartnership property to the plaintiff, for the benefit of creditors. Semon Bache & Co. and Henry B. Cahn, respectively, defendants in the above actions, afterwards obtained judgments against Phraner & Arthur, and levied execution upon the assigned property. The plaintiff had already arranged for a sale, and, to avoid probable loss, all parties agreed that the assignee's sale should take place, and out of the proceeds there should first be paid to the sheriff the amount of the judgments of Bache & Co. and Cahn, together with the sheriff's fees, which 'the sheriff should hold in lieu of the said property, without prejudice to the right of the said assignee claiming the said moneys in any action against the

sheriff, the same as though the sheriff had sold the property.' The plaintiff, as assignee, accordingly paid to the sheriff, under protest, $859.74, on account of the Bache & Co. judgments, and $881.05 on account of the Cahn judgments. These actions were brought by the assignee against the sheriff and the judgment creditors, to recover the sums so paid. The sheriff's indemnitors were subsequently substituted in his place as defendants. No objection is urged to the right of the assignee to maintain the actions. The sole defense is that the assignment was made with intent to defraud creditors, and the property levied upon was, as against defendants, the property of Phraner & Arthur. The acts of fraud alleged are: (1) Drawings by the partners of firm moneys for individual use. (2) The making of firm notes for the individual liabilities of the partners to their wives, and the insertion of the names of the latter as firm creditors in the schedules. (3) Preference of individual liabilities to the fathers of the partners. (4) Insertion of the name of a former partner in the schedules as a creditor of the firm on notes given him on his retirement, for his interest in the business.

"These will be considered in order.

"(1) *Drawings of the Partners.* Prior to May, 1886, Wilson S. Phraner's monthly drawings averaged $167.13. In May he is charged with $1,421.03, against which he is credited with $619.95, leaving his apparent drawings in May, $801.08. One of the items of charge is a firm note of $200, which has not been paid, and is now held by his wife, and is set forth in the schedules as a firm liability. Unless this note was given to discharge Phraner's individual debt, which will be considered hereafter, it is clear that he derived no personal benefit from it. Deducting the amount of thi' note, Phraner's net drawings in May appear to be $601.08. On May 5th, Phraner is charged with $402.25. This was the amount of two firm checks. drawn on this day, one for $300, in favor of S. W. Coe, and one for $102.25, in favor of Wilson Phraner, the father of Wilson S. Phraner. Both sums had been loaned in April, and were then credited to Phraner's personal account. The $300 was, however, deposited in the firm bank account as soon as received, and Phraner testifies positively that both sums were borrowed and used to defray firm expenses. If they are considered Phraner's personal debts, still fraudulent intent cannot be implied from a withdrawal of money three weeks before the assignment to pay sums borrowed by him for the use of the firm. The money was received by the firm and used by the firm, and upon the evidence it is not clear that the indebtedness was not a firm indebtedness. On May 22d, Phraner is charged with $100, the entry being 'To J. B. McN., $100.' J. B. McNabb on that day was debtor to the firm for $129.63. His account was then credited with $100, and Phraner's account is debited with the same amount. This must mean either that Phraner assumed $100 of the McNabb debt, and thus diminished the firm assets to that extent, or that he received this amount, and kept it instead of depositing it with the firm. In either event, it was an open appropriation of firm property, and should be included in his May drawings. Taking into account this $100, and deducting the $402.25, and the $200, of which Phraner had no personal benefit, and to which there does not appear to be any corresponding May credit, we find his net drawings for that month to be $198.83. Arthur's total drawings for May amount to $366.43. His credits against this are $36.39, leaving a net debit balance of $330.04. Of this $200 consists of a note made by the firm, and now held by his wife under the same circumstances as the note held by Mrs. Phraner. Deducting this, we find Arthur's cash drawings for the month to be $130.04. For the two years previous his monthly drawings had averaged $112.20. It does not appear that the assignment was in contemplation for more than a few days. The drawings above noted are in small amounts and distributed through the entire month. There is no such logical connection between the drawings and the assignment as to make the latter unlawful, even were the former excessive

and improper, and the drawings themselves can hardly be considered fraudulent. *Vietor* v. *Nichols*, 13 N. Y. St. Rep. 461.

"(2) *Notes to Wives of Partners.* On May 24, 1885, the account of each partner is charged with bills payable, $200. These notes are recited in the schedules as being respectively in the hands of their wives. That these notes were made by the firm, have not been paid, and are now held by Mrs. Phraner and Mrs. Arthur, is not disputed. It is claimed, however, that they were without consideration as against the firm, being given for individual debts of the partners, and that the insertion of the names of the wives as creditors in the schedules is proof of a fraudulent purpose to misappropriate firm assets by means of the assignment. Reliance is placed upon the fact that the notes were charged in the books to the personal account of the partners. It appears that the moneys for which these notes were given were handed over to the firm and used by the firm. The firm, and not the partners, benefited by the transaction, and the firm recognized its liability by the making of the notes. Both Mrs. Phraner and Mrs. Arthur, upon the evidence in this case, could recover upon the notes against the firm. The entries on the books are counterbalanced by the giving of the notes, and the proof that their consideration inured to the firm's benefit. There is not sufficient evidence to justify the conclusion that the notes were improperly made to pay the partners' individual debts, and that the names of the wives were inserted in the schedules with fraudulent intent.

"(3) *Bills Payable Preferred.* Wilson Phraner and George D. Arthur, the fathers of the partners, are preferred in the assignment for the sums of $2,850 and $2,600, respectively. George D. Arthur's preference is for the amount of two notes,—one for $2,000, made April 19, 1886, and the other for $600, made May 15, 1886. The $2,000 note was given by the firm in renewal of a note for the same amount, discounted for the firm by George D. Arthur, in February, 1886. The $600 was for cash received by the firm on the day the note was given. There is no evidence that the firm was not justly indebted on these notes, or that the preference was improper. Wilson Phraner, the father of Wilson S. Phraner, is preferred for a note of $2,000. This was given in renewal of a note discounted with him by the firm, which received the proceeds of the discount. He is also preferred for a note of $850, made May 15, 1886. A firm note for $250 was then outstanding for money received by the firm on May 4th. On May 15th the firm received $600 additional, and the note of $250 was surrendered, and the note for $850, the subject of the preference, was given. It is not disputed that Wilson Phraner holds the notes preferred. It is insisted, however, that they were given for the individual indebtedness of Wilson S. Phraner, the partner. The avails of the discounted note of $2,000 and the $600 are credited and the notes charged in the bills payable account of the firm, and do not appear in the personal account of Wilson S. Phraner. The $250 received on May 4th, though paid to the firm, was credited to his personal account in which the note for the same amount was charged. The original checks for both the $1,969, (dated February 12, 1886, the proceeds of the $2,000 discount,) the $600, (dated May 14th,) and the $250, (dated May 4th,) are produced and are in evidence, all drawn by Wilson Phraner,—the first to the order of Hough & Phraner, the other two to the order of Phraner & Arthur. Upon this evidence it cannot be said that there was no firm liability, and that the preference was fraudulent.

"Much that is said in hostility to the assignment is based upon entries in the personal accounts of the partners in the firm books. Upon these it is claimed that the notes held by their wives were given for the individual debts of the partners, and that no firm liability was incurred, though the moneys loaned were immediately devoted to the firm uses. The $250 loaned by Wilson Phraner on May 4th was clearly loaned to the firm, used by the firm, the firm recognizing its liability by giving its note, and then preferring it. Still

this sum is credited, and the note charged to Wilson S. Phraner's personal account. Little reliance can be placed upon a book-keeper's entries which are so lacking in method, in the absence of any other evidence, invalidating the obligations admittedly given by the firm.

"It is suggested, however, that the advances of $200 each by the fathers in February, 1886, were advances to their sons for the purpose of increasing their interests in the firm. Reference is had to the fact that the fathers started their sons in business by loaning them their necessary capital in 1883 and 1884. It is also urged that as Mr. Hough, then a member of the firm, in January, 1886, contributed $2,057 in notes as capital, these almost simultaneous advances of similar sums must also be considered as contributions to capital. The assignment cannot be set aside upon mere suspicion. The difficulty with the contentions of counsel is the absence of evidence to support them. There is no evidence that the advances were to increase the holdings of the two partners, and a mere coincidence in time and amount with another partner's contribution to his capital account is insufficient to determine the character of independent transactions. There is no pretense that the firm expected to fail in February, and no reason why the advances, if made as capital, should not appear in the capital account. They do not so appear, however, although Hough's capital account is duly credited with his contribution, which was admittedly for the purpose of increasing his interest. Six hundred dollars borrowed by Phraner of his father for a similar purpose in January, 1886, appeared in his capital account, and the absence of the sums in question from this account negatives the inferences drawn by counsel.

"(4) *The Hough Notes.* Prior to April 14, 1886, L. W. Hough was a member of the firm. The firm had taken an inventory on January 1, 1886, showing a surplus of over $9,000. This surplus had been credited to the capital account of the three partners. On January 22, 1886, Hough contributed, as capital, $2,057.07 in notes. On April 14, 1886, the firm dissolved, and the interest of Hough was purchased by Phraner & Arthur, the consideration being the return of the notes for $2,057, and the notes of P. & A. for $1,747.76, Hough's share in the surplus. There is no evidence to impugn the good faith of the transaction. The firm was abundantly solvent, according to its books, on January 1st. The books showed no marked change on April 14th. The members of the firm believed that it was solvent, and, so far as the evidence shows, bought out the retiring partner in good faith, by giving notes for the face value of his interest. It is contended that the firm was insolvent at the time of the retirement; that Hough's interest in the business was worthless; that the notes given him were in law fraudulent as against other creditors; and that the insertion of Hough's name as a creditor for the amount of these notes, in the schedules, indicates an intent to divert the assets of the firm and avoid the assignment. The schedules may, of course, be referred to to show the intent with which the assignment was executed. If a fictitious claim is inserted in the schedules by the assignors, it may indicate an intent to misappropriate the assets. *Talcott* v. *Hess*, 31 Hun, 282. In this case, however, the claim is not fictitious. A bargain was made between Hough and P. & A. in good faith, which bound P. & A. If void at all, it would only be so as against creditors. The claim might be a deferred claim, but was none the less a claim. There was no attempt at concealment of the facts. The schedules state that the notes were given for moneys due Hough 'on the dissolution of Hough, Phraner & Arthur.' Upon these facts it does not necessarily follow that the mere insertion of Hough's name in the schedules as a creditor would avoid the assignment. *Howe* v. *Lawrence*, 9 Cush. 553; *Smith* v. *Howard*, 20 How. Pr. 121; *Dimon* v. *Hazard*, 32 N. Y. 65. It seems clear, however, that the entire force of this objection to the assignment rests upon the insolvency of the firm at the time of Hough's retirement. This is not proven. The actual condition of the firm at this time is not shown. It is

true that Phraner, the only one of the partners who is called as a witness, testifies that he cannot recollect any serious losses between April 14, 1886, the day of Hough's retirement, and May 29, 1886, the day of the failure. The cause of the failure was embarrassment and delay in payments by firm debtors. An expert accountant testifies that, so far as the books show, the surplus of January 1, 1886, should belong to the firm on May 29th, less the notes given Hough and the drawings of P. & A. The assignment itself does not contain the usual recital of insolvency. The schedules are in evidence, and show that at the time of the failure the liabilities amounted to $22,608.32. Of these, $2,591.57 were contingent. These have all been met by the parties primarily liable, and should be deducted to ascertain the firm's actual condition. The actual liabilities are therefore $20,016.71. As against these the assets appear nominally worth $24,777.51, and actually worth $17,222.74. At the time of the failure, therefore, the books show an apparent surplus of $4,777, although the Hough notes are included in the liabilities. The schedules set forth, item by item, the nominal and actual value of the firm accounts and merchandise in the usual form. The total actual value of the good accounts is, however, afterwards reduced $750, by a deduction of ten per cent. to meet cost of collection, and the total actual value of the merchandise is similarly reduced about $3,100, by a deduction of twenty-five per cent. for depreciation and cost of sale, so that in the recapitulation given above $3,850 seems to have been deducted as the estimated expense of conducting the assigned estate after the failure. The total actual value of the assets, at the time of the assignment, therefore, was apparently over $21,000, or $1,000 above the liabilities, including the Hough notes, while the nominal surplus was nearly $5,000. These facts do not justify the conclusion that the firm was insolvent six weeks previous, on April 14th, or that a transaction which, so far as the evidence shows, was free from actual fraud, was fraudulent in law.

"Counsel contends, however, that if the firm was solvent at that time, there has been a mysterious disappearance of assets. The surplus of January 1, 1886, deducting Hough's share, was about $8,000. The apparent nominal surplus on May 29th was about $4,800; actual, about $1,000. The difference, $3,800, between the face and actual value, is made up of $3,100, depreciation on fixtures and sundries, due to wear and tear, and $650, lost on open accounts. Irrespective of these items, the firm has actually lost only $3,200 in the five months, and this includes the amounts drawn by the partners. No exhaustive examination of the firm's business has been presented, and these facts do not support a finding that there has been any withdrawal of assets so connected with the assignment as to render the latter invalid. If the firm was solvent on May 29th, that fact alone does not invalidate the assignment. *Ogden* v. *Peters*, 21 N. Y. 23; *In re Thompson*, 30 Hun, 200. The evidence shows embarrassment, and a sufficient basis for a finding of an honest purpose in making the instrument, which must be presumed until it is disproven.

"All the points urged by defendants' counsel have been carefully examined. The transactions of the partners, with their wives and relatives, easily give rise to suspicion, but the facts proved are insufficient to base a finding of fraudulent intent in the making of the assignment. It is urged that, as persons conversant with the matters in dispute are not called as witnesses, it should be presumed that their testimony would be adverse to the plaintiff. Phraner was examined at length, and his testimony is unimpeached. The defendants have not proved, by any preponderance of evidence, the fraud alleged, and it was unnecessary for the plaintiff to lengthen the case by a production of further testimony. *Bleecker* v. *Johnston*, 69 N. Y. 309. The plaintiff is entitled to judgment in both cases."

Argued before LARREMORE, C. J., and DALY and VAN HOESEN, JJ.

*Blumenstiel & Hirsch,* for appellants. *Charles H. Griffin,* for respondents.

VAN HOESEN, J. I am in favor of affirming the judgment. There is no clear and unmistakable fraud on the part of the assignors. The charge of fraud rests upon inferences, suspicions, and computations. As those do not make a strong case, we are asked to draw an unfavorable conclusion from the fact that the wives of the assignors were not called as witnesses. We see no reason to suspect that the assignors have suppressed testimony that was needed to explain their acts, and remove a well-grounded presumption of fraud. The testimony of Mr. Phraner, one of the assignors, was satisfactory to the referee, and I see no reason why it ought not to have been so. I am in favor of affirming the judgment upon the report of the referee. All concur.